JAMES F. KENDRICK and DELORES KENDRICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kendrick v. Commissioner
Docket No. 12246-78.
United States Tax Court
T.C. Memo 1980-270; 1980 Tax Ct. Memo LEXIS 315; 40 T.C.M. (CCH) 741; T.C.M. (RIA) 80270; July 24, 1980, Filed *315 Petitioner operated a business as a sole proprietor. He systematically understated his business gross receipts by approximately 12 percent for each of the three taxable years before us. This resulted in an understatement of his adjusted gross income by 100 percent. Held: On the record before us we conclude that petitioner's systematic understatement of income was the product of mala fides exclusion of amounts from gross receipts with the purpose of evading income taxes he knew to be due. Held further: fraud penalty properly imposed. Wlliam J. Cooney, for the petitioners. Albert L. Sandlin, Jr., for the respondent. STERRETT
MEMORANDUM *316 FINDINGS OF FACT AND OPINION STERRETT, Judge: * By a letter dated August 17, 1978 respondent determined deficiencies and additions to tax due from petitioners as follows: Sec. 6653(b)
Taxable Year Ended
Deficiency
Additions to Tax
December 31, 1971
$1,932.00
$11,503.00
December 31, 1972
$2,516.96
$13,082.11
December 31, 1973
$5,151.67
$16,061.83
After concessions the only issue for our decision is whether respondent is entitled to his claimed fraud penalty. Our conclusion on this point will decide the question whether the statute of limitations for the taxable years before us had run prior to the time respondent mailed his notice of deficiency. Respondent has conceded that petitioner Delores Kendrick is not liable for the additions to tax. Petitioners have conceded the deficiency amounts shown above. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners James F. and Delores *317 Kendrick, husband and wife, resided in North Augusta, South Carolina, at the time they filed their petition herein. Petitioners timely filed joint Federal income tax returns on the cash basis for their taxable years ended December 31, 1971, December 31, 1972, and December 31, 1973, with the Internal Revenue Service Center at Chamblee, Georgia. Petitioners filed amended returns of income for these taxable years in 1975 and paid the increased tax shown thereon. As Mrs. Kendrick is a party hereto solely by virtue of having filed jointly with her husband, "petitioner" as used herein shall refer only to Mr. Kendrick. Petitioner has been engaged in the automobile paint and body repair business since approximately 1951. During the taxable years before us petitioner operated by way of a sole proprietorship doing business as Kendrick's Paint and Body Shop. During the years before us petitioner derived his income from this body shop, as well as other sources, such as sales of junk automobiles and interest. Petitioner's wife had no source of income except interest on bank accounts in her name. When Mr. Kendrick first opened his business in 1951 he had little or no experience or knowledge *318 with respect to bookkeeping and accounting. He, therefore, arranged for a friend, with experience as a bookkeeper, to teach him the rudiments of keeping a so-called "DOME" journal, which is in essence a single entry method of accounting. This friend came periodically during the first months that petitioner was operating to oversee his books. Petitioner utilized this single entry method of accounting from 1951 through the taxable years before us.
Petitioner accounted for his gross receipts generally as follows: Petitioner's business was repairing the bodies of and painting automobiles. When a car came in petitioner would make out a work order showing the work to be done. As work was performed and parts used the cost thereof would be posted to the work order. When the work was complete, the charges on the work order would be totaled. When the work order was paid in full petitioner would mark it paid. At the end of the week petitioner would total the amounts of all work orders paid in full during that week on an adding machine tape and enter the total in the DOME book as gross receipts. He would then tie the work orders themselves together and put them in a drawer. If a work order *319 was only partially paid, the partial payment would not be entered in the DOME book. However, the entire work order amount would be entered in the DOME book when the work order was fully paid. Periodically, petitioner would deposit his gross receipts in a business bank account. Throughout the years before us petitioner's tax returns were prepared by various CPA's. For each of the taxable years before us petitioner provided only his DOME book for that taxable year to the CPA return preparer who then made up petitioner's return solely from the information disclosed therein. For each of the taxable years before us, petitioner failed to enter in the DOME book for that year approximately 12 percent of his gross receipts. As a result of this understatement, petitioner's adjusted gross income was continuously understated by approximately 100 percent per taxable year. At no time did petitioner's return preparers ask for petitioner's banking records which would have, as a general matter, more accurately disclosed petitioner's actual income. Petitioner personally kept the DOME journal, prepared all business records and work orders, totaled his work orders, and deposited his receipts *320 in his business bank account. Indeed, petitioner controlled all aspects of his business except the actual preparation of his income tax returns. Petitioner never reconciled the DOME journal to his bank deposits. As found, petitioner filed timely returns of income, Forms 1040, for each of his taxable years 1971, 1972 and 1973. Also as found, in 1975, after respondent's investigation of petitioner's returns had begun, petitioner filed amended U.S. individual income tax return Forms 1040X for each of these taxable years. The original and amended returns revealed the following: 1971
Orig.
1040X
Gross Receipts
$293,491.00
Gross Business Profit
50,300.00
Net Business Profit
29,932.00
Adjusted Gross Income
Gross Business Profits
29,932.00
Interest
+12,258.00
$42,190.00
84,690.00
Taxable Income
36,686.00
Tax Paid
11,217.00
32,290.35
1972
Orig.
1040X
Gross Receipts
$345,476.35
Gross Business Profit
65,963.68
Net Business Profit
31,838.73
Adjusted Gross Income
Gross Business Profits
31,838.73
Interest
+13,951.82
$45,790.55
92,885.17
Taxable Income
41,540.55
Tax Paid
12,730.33
36,377.58
1973
Orig.
1040X
Gross Receipts
$444,261.54
Gross Business Profit
82,770.82
Net Business Profit
39,208.28
Adjusted Gross Income
Gross Business Profits
39,208.28
Interest
+18,206.40
57,414.68
112,401.88
Taxable Income
53,164.68
Tax Paid
19,163.95
46,135.94
*321 Petitioner deposited all of his business receipts in a business bank account, Account No. 001-846-2, he maintained at the Georgia Railroad Bank in Augusta, Georgia. The amounts actually deposited, which in general represented petitioner's true business gross receipts, the gross receipts reported by petitioner on his original return, and the December 31 balance of petitioner's business checking account, less outstanding checks, for each of the taxable years 1970, 1971, 1972 and 1973 are as follows: Business Bank Account
Gross Receipts Per
Actual Gross
Original Return
Receipts
% Change
Ending Balance
1970
$ $ $102,065.52
1971
293,491.00
336,496.05
12.78%
91,690.32
1972
345,476.35
388,381.51
11.04%
110,196.41
1973
444,261.54
527,622.91
15.79%
102,439.85
The percent increase in petitioner's adjusted gross income between his original and amended returns and his percent understatement of adjusted gross income are as follows: 1971
1972
1973
Increase
50.18%
50.70%
48.92%
Understatement
100.7%
102.84%
95.77%
As part of his business of body repairing and painting, petitioner would occasionally *322 take possession of cars later abandoned by their owners. In such a case, petitioner would hold the car for a reasonable length of time and then sell it to a disposal company for salvage in order to recoup all or part of its storage and other costs. During the years before us, petitioner received the following amounts from the following sources with respect to the sale of junk autos: Salvage Disposal Co.
Gibbs Auto Parts
1971
$1,741.50
$1,398.70
1972
1,510.00
3,566.65
1973
2,942.00
2,712.00
None of these amounts were included in petitioner's income except $459.15 paid by Gibbs Auto Parts in 1972. Petitioner had undeposited cash on hand on December 31 of each of the years 1970, 1971, 1972, and 1973 never exceeding the sum of $3,000. Mrs. Kendrick did not have any undeposited cash on hand as of said dates. Petitioner acquired a variety of certificates of deposit as seen below: Not Held
Cost Basis
As of
Issuer
Serial No.
Acq. Date
As of
$25,000
12/31/70
Georgia Railroad
T 70803
2/20/70
12/31/72
Bank &
Trust Co.
26,200
12/31/70
Trust Co.
T 70804
2/20/70
12/31/72
100,000
12/31/73
Trust Co.
T 70805
2/20/70
*
25,000
12/31/73
Trust Co.
35307
7/21/71
*
25,000
12/31/73
Trust Co.
35308
7/21/71
*
25,000
12/31/73
Trust Co.
35309
7/21/71
*
100,000
12/31/73
Trust Co.
A-5411
7/27/73
*
*323 All these certificates of deposit were purchased and held by petitioner in the names of "James F. Kendrick or Delores S. Kendrick." Throughout the years 1970 through 1973 inclusive, petitioner had a variety of checking accounts. The bank in which the account was held, the account number, the account name and type, and the deposit in each account as of December 31 (less outstanding checks) was as follows: Bank
Acct. No.
Name/Type
Balance/Dec. 31, 19
1. Georgia Railroad
106-245-0
Mr. & Mrs. James
$ 1,187.19/70
Bank & Trust Co.
F. Kendrick/
911.13/71
Personal
1,133.60/72
999.76/73
2. Georgia Railroad
011-846-2
Kendrick Paint
102,065.52/70
Bank & Trust Co.
& Body Shop/
91,690.32/71
Business
110,196.41/72
102,439,85/73
Petitioner and/or his wife held savings accounts as follows: 1. Bankers Trust of
10-2822-
Mr. J. F.
16,870.94/70
South Carolina
0762
Kendrick
17,552.53/71
- 0 - /72
- 0 - /73
2. Palmetto Federal
101864-4
Mrs. James F.
12,192.30/70
Savings & Loan
Kendrick
12,813.42/71
Assoc. of Aiken
13,466.17/72
14,152.19/73
3. First Federal
43316
James F.
14,289.06/70
Savings & Loan
Kendrick
15,017.01/71
Assoc. of Augusta
15,782.03/72
16,586.02/73
4. Assoc. of Augusta
49540
Delores
6,205.61/70
Kendrick
6,521.75/71
6,853.99/72
7,203.13/73
5. Georgia Railroad
521-269-1
James
35,641.20/70
Bank & Trust Co.
Kendrick
37,302.22/71
4,650.68/72
4,864.72/72
6. Bank & Trust Co.
521-989-4
Mr. James
15,059.84/70
Kendrick
15,761.71/71
- 0 - /72
- 0 - /73
*324 On May 20, 1970 petitioner purchased a 1970 Buick automobile for $4,350. Petitioner owned this car throughout each of the taxable years ended December 31, 1970 through December 31, 1973. In 1972 petitioner purchased a new building in which to operate his business. Petitioner paid the full purchase price thereof, $126,000 by cashier's check. Petitioner owned various depreciable assets including business buildings and equipment on the dates shown below. 12/31/70
12/31/71
12/31/72
12/31/73
Assets (per
Returns)
$33,428.45
$33,428.45
$188,845.72
$185,265.10
Less Land
6,000.00
6,000.00
46,000.00
46,000.00
Depreciable
Assets
$27,428.45
$27,428.45
$142,845.72
139,265.10
Throughout the years before us petitioner owned a parcel of land and the house thereon located in North Augusta, South Carolina. Petitioner had acquired the land in 1955 for $2,250. He built the house in 1956 for a total cost of $19,553.42. Throughout the years before us petitioner owned a parcel of real estate located in Augusta, Georgia. Petitioner purchased this lot in 1961 for $6,000. On October 2, 1972 petitioner purchased the real estate at 1333 Broad Street, *325 Augusta, Georgia, for $40,000. During the years 1971, 1972 and 1973 petitioner expended for personal living expenses and other purposes, for which no deduction is allowable, the following amounts: Items of Expenditures
Expenditures During the Year
1971
1972
1973
(1) Federal income
taxes paid
$4,617.00
$15,205.00
$13,819.33
(2) State of South
Carolina income
taxes paid
152.50
292.50
571.73
(3) State of Georgia
income taxes paid
474.00
1,711.00
1,536.62
(4) Personal living
expenses as computed
below:
Computation of Personal Living Expenses
1971
1972
1973
Balances in Personal
checking account as of
January 1:
$ 1,187.19
$ 911.13
$ 1,133.60
Deposits
10,147.80
11,051.67
9,833.78
Available
$11,334,99
$11,962.80
$10,967.38
Balance as of
December 31:
911.13
1,133.60
999.76
Expenditures
10,423.86
10,829.20
9,967.62
Add: Expenditures from
Business: Murphy & Sons
Drug Store
232.17
84.18
119.65
Delores Kendrick
1,421.66
Life & Casualty
Insurance Company
155.00
155.00
155.00
Equitable Life
Assurance Society
1,635.48
1,635.48
1,635.48
Total Personal
Expenses
$12,446.51
$12,703.86
$13,299.41
*326 During the years before us, petitioner and Mrs. Kendrick each owned assets, the ownership of which has been specified above, having a total cost basis of $414,393.63, $483,451.96, $542,182.02 and $632,761.19 as of December 31 of each of the years 1970, 1971, 1972 and 1973, respectively. Petitioner and his wife had no liabilities during these taxable years. All assets purchased were paid for in full. Petitioner, as of December 31 of each of the years 1970 through 1973, had accumulated depreciation on his business assets as follows: 12/31/70
12/31/71
12/31/72
12/31/73
Depreciation
(per returns)
$19,728.51
$21,764.51
$16,654.60
$23,753.42
Petitioner did not receive any amounts of nontaxable or excludable receipts for which an adjustment should be made in the computation of their correct taxable income for the years at issue.
The net worth of petitioner and his wife at the end of each of the years 1970 through 1973 and the increase in their net worth during each of such years was as follows: Net Worth
Increase in Net
Year
At December 31
Worth During the Year
1970
$394,665.02
$0
1971
461,687.45
67,022.43
1972
525,527.42
63,839.97
1973
609,007.77
83,480.35
*327 During the years 1971 through 1973, inclusive, petitioners did not borrow or receive from nontaxable sources any funds or assets not properly taken into account by respondent which would account for the above noted increases in net worth. OPINION Petitioner understated his taxable income by approximately 100 percent for each of the three taxable years before us. [1] Indee, petitioner indicated at trial that it is probable that a similar percent of his taxable income was not reported for each of his taxable years since 1951. Petitioner argues that this pattern of unreported income was a product of his lack of accounting sophistication and minimal formal education, combined with a built-in 12 percent error in reporting business gross receipts peculiar to petitioner's DOME single entry accounting method. Respondent claims that the underreporting was fraudulent. The propriety of respondent's claimed fraud penalty is the only issue before us. If any part of the underpayment of tax conceded by petitioner for any particular year was due to fraud with an intent to evade *328 tax believed to be owing, then respondent's section 6653(b), I.R.C. 1954, claim must be sustained. [2] The burden is upon respondent to show, by clear and convincing evidence, that some part of the conceded understatement for each of the years at issue was due to fraud within the meaning of section 6653(b). Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner, 276 F.2d 122, 128 (5th Cir. 1960). The question is one of fact. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stratton v. Commissioner, 54 T.C. 255, 284 (1970). To prove fraud the Commissioner must show that the taxpayer intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, *329 mislead or otherwise prevent the collection of such taxes. Stoltzfus v. Commissioner, 398 F.2d 1002, 1004 (3rd Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968); Marcus v. Commissioner, 70 T.C. 562, 577 (1978). Fraud has been defined to be: * * * actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed and the courts will not sustain findings of fraud upon circumstances which at the most create only suspicion. [Citation omitted] [Ross Glove Company v. Commissioner, 60 T.C. 569, 608 (1973). Quoting Mertens, Law of Federal Income Taxation, Sec. 55.10, p. 46 (1970 Rev.); Footnotes omitted.] The required proof may be supplied by circumstantial evidence. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Although the mere understatement of income alone is not sufficient *330 to prove fraud, the consistent and substantial understatement of income is, of itself, strong evidence of fraud. Marcus v. Commissioner, supra at 577; Holland v. United States, 348 U.S. 121, 139 (1954); Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court. Yet we are mindful of the fact that fraud must be affirmatively shown to exist. Estate of Beck v. Commissioner,56 T.C. 297, 363 ( 1971). Thus while we hold for respondent on this issue, we do so not only upon the basis of petitioner's continuous and substantial understatements of income, but upon the other objective facts in the record which indicate fraud. We admit that this case is somewhat unusual. The trial judge resigned after hearing the case and was, therefore, not available for reference. Notice of Reassignment was served upon the parties on March 7, 1980. At that time the Court cautioned the parties that: "If any motions are contemplated in connection with this case, they should be filed on or before March 31, 1980." No such motions were made. While we have not had a first-hand view of petitioner *331 on the stand, we have studied the transcript carefully. Further, we find that sufficient objective facts are present in the record to render a decision possible without recourse to witness demeanor. The core of petitioner's case is his claim that some undetectable built-in peculiarity of his DOME bookkeeping method caused him, an untutored autombile painter, to understate continuously and unwittingly his gross receipts by 12 percent with the consequence of an understatement of his adjusted gross income of over 100 percent. We cannot accept this contention. The fact remains that the understatements before us could have occurred in only one way: petitioner consistently and systematically failed to report approximately 12 percent of his gross receipts.He did this by the systematic, and we believe intentional, expediency of simply not adding into his week's gross receipts, work orders representing approximately 12 percent of his gross receipts. It does not require any accounting sophistication to realize that, if you account for your gross receipts by way of work orders and if you throw away or otherwise exclude a work order from your addition, the amount of that work order will *332 not appear in gross receipts and, therefore, will not appear in income. These acts of omission were compounded by petitioner's failure to reconcile his bank statements to his income. Further, petitioner's work orders were in so much disarray that no one could trace his deliberate exclusions by way of a review of his work orders alone. Failure to keep adequate records is another indicia of fraud. Marcus, supra at 578; Powell v. Granquist, 252 F.2d 56, 59, 60 (9th Cir. 1958), see Plunkett v. Commissioner, supra at 303. An occasional error or omission is one thing, and accordingly we note, but do not over-emphasize petitioner's total failure to include his receipts from Salvage Disposal Company and Gibbs Auto Parts. However a continual, perhaps even decades long, pattern of omission of a fixed 10 to 12 percent of his gross receipts cannot qualify as a good faith or even negligent error. The numbers themselves make it difficult to come to any conclusion other than that of fraud. Petitioner has admitted the omission of some $154,000 in taxable income in the 3 years before us, an amount that represents approximately one-half *333 his true taxable income. His net worth went from $395,000 as of December 31, 1970 to $609,000 as of December 31, 1973. It would be difficult to be unaware of an increase in net worth in 3 years of over $200,000 or 50 percent. Petitioner may not have had much formal education but he was shrewd enough to operate a business whose gross receipts rose from $337,000 in 1971 to $528,000 in 1973. Further, he was sophisticated enough to invest his excess funds, some $175,000 in certificates of deposit in 1971 and 1973. Still further he knew enough about bookkeeping not to understimate his expenses. The pattern of fraud is inescapable. On the record before us we are comfortable with our conclusion that respondent has carried his burden, by clear and convincing evidence, that petitioner filed his returns for the years at issue with mala fides, with a conscious intent to evade the taxes that he knew to be due. Decision will be entered for the respondent. Footnotes
*. This case was reassigned from Judge William H. Quealy to Judge Samuel B. Sterrett↩ by Order of the Chief Judge dated May 21, 1980.
*. Held throughout the taxable years before us.↩
1. The average understatement of the petitioner's income for the years before the Court was 99.77 percent.↩
2. SEC. 6653(b)↩.FRAUD.--If any part of any underpayment (as defined in subsection(c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount de-determined under subsection (a). [negligence penalty]